UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| **AXIALL CANADA INC** | **CASE NO. 2:20-CV-01535** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **M E C S INC** | **MAGISTRATE JUDGE KAY** |

**MEMORANDUM RULING**

Before the court is a Motion for Summary Judgment [doc. 96] filed by defendant MECS, Inc. Plaintiff Axiall Canada Inc. ("Axiall") opposes the motion. Doc. 117.

**I.**
**BACKGROUND**

This suit arises from the sale of mist eliminators (also known as "demisters") by MECS, a manufacturing company specializing in equipment used in the chemical manufacturing and processing industry, to Axiall Canada, which owns and operates a chlor-alkali manufacturing facility in Beauharnois, Quebec. *See* doc. 1, att. 1. Specifically, Axiall contends that the demister elements sold to it by MECS failed shortly after installation and resulted in a shutdown of the plant. It filed suit against MECS in this court, raising claims for breach of contract, breach of express and implied warranty, and redhibition. *Id.* MECS maintains that it provided the equipment in conformity with Axiall's specifications and that the equipment failures were caused by other issues at the plant. It now moves for summary judgment on all of Axiall's claims. Doc. 96.

The Axiall plant in Beauharnois produces chlorine gas through an electrolysis process. Doc. 96, att. 3, p. 12. As part of this process, a hot chlorine gas must pass through a series of coolers to strip it of its moisture content and then move through wet and then dry demisters. *Id.* at 12–14. If the demisting does not work properly, it creates a risk of harm to downstream equipment. *Id.* at 14–15. Specifically, "[l]iquid bypass of the wet demister elements may lead to reaction of sodium with sulfuric acid to produce solid sodium sulfate ($Na_2SO_4$) solids that can accumulate in the sulfuric acid . . . and plug the dry demister elements and downstream chlorine compressors." *Id.* Demisters rely "on mechanical principles to coalesce and remove the liquid aerosols from the gas stream as it passes through an element with some sort of packed media." *Id.* at 15. The demisters at Axiall used wound or packed fiber beds. *Id.*

In March 2019, Axiall's facility in Beauharnois was equipped with standard pack wet demisters manufactured by Koch-Glitsch, LP ("Koch"). Doc. 96, att. 4, pp. 16–25. That month, Axiall experienced a failure of the wet demisters that resulted in high chlorine pressure and a plant shutdown lasting approximately 55 hours. Doc. 96, att. 4, pp. 1–15. According to Axiall's Root Cause Analysis, the failure of the wet demisters was caused by (1) a broken drop pipe, (2) undetected material corrosion, and (3) an out-of-date maintenance plan with no specific frequency. *Id.* at 2. After the shutdown, the demisters were replaced with spare elements but these did not function properly due to age and degradation. *See* doc. 96, att. 5, p. 27. Axiall then contacted MECS in May 2019 about purchasing new beds for their wet demisters and provided photographs of the materials currently in place. *Id.* at 29–35, 43–44. MECS indicated that it understood Axiall's request

to be for replacement of what was previously in place and that there had been no changes to its processes that would require different equipment. *Id.* at 39, 43–44. Specifically, MECS testified:

> And they were an existing customer of ours. We had sold them fiber beds in the past. As I recall, somewhere in the early 1990s we had sold them a set of beds for spare in their plant. So we—we generally knew what their process conditions were, namely at that time the flow rate, the pressure, that is, the static pressure, in the system. Also, the temperature as well.
> And we normally provide replacement beds to existing clients in kind. That is, if they need a new set of fiber beds, we provide them the same thing they have previously. However, knowing from the normal chain of events that typically happens in a plant, we ask them, have there been any process changes since we've last provided mist eliminators? The most critical of those being, have there been any flow rate changes. And this was all in conversation on the phone with the client as well. And they told us at that time, no, there's been no process changes. We . . . are producing the same amount of chlorine that we have during this entire time. And so we deemed it perfectly reasonable to provide them a set of fiber beds just like we had previously provided.

Doc. 17, att. 2, pp. 9–10. MECS also testified, however, that it had been more than 20 years since it last supplied mist eliminators to the Beauharnois plant and that it understood that plants typically want to increase production over time in order to make more profit. *Id.* at 41. MECS further stated:

> And . . . we received some information, and it was in conflict with other information we received from other employees in subsequent discussions. And there was quite a bit of confusion, it seemed, about where exactly the target is. You know, like having a target in front of you in the dark. It was— it was like every time we asked the question, we got a slightly different answer or variation thereof.

*Id.* at 42.

MECS provided Axiall with proposals for standard ES 208-style wet demister elements in August 2019. Doc. 96, att. 5, pp. 91–102. The proposals state at the top: "Every

design is custom engineered to meet our client's unique requirements. Should you have any questions regarding our proposal, please do not hesitate to contact us." *Id.* at 92. Axiall purchased the demister elements, but issues arose within weeks of their installation. In the fall, MECS sent Axiall written requests for more information about the flow rate given what it deemed prior inconsistent information from the latter's employees. Doc. 17, att. 2, p. 42–43. In response to these requests it learned that Axiall had added two additional electrolyzer cells in 2018, which had increased plant capacity by roughly 4.5 percent. *Id.* at 154; doc. 117, att. 5, p. 107; *see* doc. 96, att. 4, pp. 16–18. MECS was finally able to solve the issues, after months of troubleshooting, by installing thick pack demisters, an alternative design. Doc. 96, att. 1, pp. 13–14. It maintains, however, that even the updated process conditions information supplied by Axiall supported the selection of standard pack demisters. *See* doc. 96, att. 3 (Exponent expert report).

Axiall filed suit in the Fourteenth Judicial District, Calcasieu Parish, Louisiana, on October 3, 2020, raising claims of breach of contract, breach of express and implied warranties, and redhibition.[1] Doc. 1, att. 1. MECS removed the matter to this court based on diversity jurisdiction. Doc. 1. It then filed a motion to compel arbitration and dismiss, which the court denied. Doc. 21. The Fifth Circuit affirmed that ruling and the matter is set for trial before the undersigned on August 21, 2023. Doc. 39; doc. 98. MECS now moves for summary judgment on all claims, asserting that the products it provided were not defective, were the standard elements for this particular use and warranted based on the

---

[1] This venue was selected pursuant to a forum selection clause in Axiall's purchase orders. Doc. 9, att. 1, p. 4.

information Axiall had provided, and that there is no way to determine why MECS's demisters did not work in Axiall's system. Doc. 96, att. 1. Axiall opposes the motion, maintaining that fact issues exist as to whether the product MECS sold Axiall was fit for the Beauharnois facility's needs and intended use. Doc. 117.

## II.
### SUMMARY JUDGMENT STANDARD

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). He may meet his burden by pointing out "the absence of evidence supporting the nonmoving party's case." *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). The non-moving party is then required to go beyond the pleadings and show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To this end he must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable

to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

## III.
## LAW & APPLICATION

### A. Choice of Law

The parties first contest whether Louisiana or Missouri law should govern this dispute. In a diversity case, the "choice of substantive law is governed by the forum state's choice of law rules." *Allison v. ITE Imperial Corp.*, 928 F.2d 137, 138 (5th Cir. 1991). Louisiana follows a two-step procedure, first determining whether there is a true conflict among the relevant state laws. *In re Combustion, Inc.*, 960 F.Supp. 1056, 1067 (W.D. La. 1997). If there is no conflict, the court applies the law of the forum state. *W.R. Grace & Co. v. Cont'l Cas. Co.*, 896 F.2d 865, 874 (5th Cir. 1990). If there is a conflict, however, then the court determines which state's policies would be most impaired if its law were not applied to the dispute. La. C.C. arts. 3515 and 3537; *e.g.*, *Deloach v. Spray Foam Insulation, LLC v. Briggs & Stratton Corp.*, __ F.Supp.3d __, 2022 WL 1757648 (W.D. La. Dec. 9, 2022).

### 1. Existence of a conflict

The warranty against redhibitory defects exists in every sale under Louisiana law. La. Civ. Code art. 2520; *Johnson v. CHL Enterps.*, 115 F.Supp.2d 723, 728 (W.D. La. 2000). A claim arises when the defect "renders the thing useless, or its use so inconvenient

that it must be presumed that a buyer would not have bought the thing had he known of the defect" or "diminishes [the thing's] usefulness or value so that it must be presumed that a buyer would still have bought it but for a lesser price." La. Civ. Code art. 2520. Meanwhile, the most analogous claim under Missouri law is the implied warranty of merchantability. *See* Mo. Ann. Stat. § 400.2-314. "[T]o be unmerchantable, a defect must leave a product unfit for the purpose for which it was designed." *Holman v. Ali Indus., LLC*, __ F.Supp.3d. __, 2023 WL 1438572, at *9 (W.D. Mo. Feb. 1, 2023).

The two theories cover similar defects and are both quasi-contractual in nature. Under both theories, a plaintiff may recover consequential damages. *Groppel Co., Inc. v. U.S. Gypsum Co.*, 616 S.W.2d 49 (Mo. App. 1981); *Hollybrook Cottonseed Processing, LLC v. Carver, Inc.*, 2011 WL 2214936, at *3 (W.D. La. June 6, 2011). More importantly, however, attorney fees are only available under a redhibition claim and Axiall has asserted such a claim here. La. Civ. Code art. 2545; *see* doc. 1, att. 1. Accordingly, Missouri and Louisiana law conflict in this matter and the court must proceed to the second step of the conflict analysis.

### 2. Impairment of state interest

The next step requires the court to examine which state's policies would be the most seriously impaired if its laws were not applied, based on the

> strength and pertinence of the relevant policies . . . in the light of (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting

multistate commercial intercourse, and of protecting one party from undue imposition by the other.

La. Civ. Code art. 3537.

The closest thing to a Louisiana contact identified by Axiall is the presence of its corporate parent in Houston, Texas, and the fact that MECS has sold demisters to facilities in Louisiana (including "sister facilities" of the Beauharnois plant).[2] Missouri, on the other hand, is the site of MECS's headquarters as well as the location from which it negotiated this sale. Missouri thus has a stronger interest in applying its state law, given its relationship to the manufacturer at issue and the absence of any real connection between Louisiana and any party to the suit. Accordingly, the court will apply Missouri law to the matter.

### B. Breach of Express Warranty

Axiall relies on the statement at the front of MECS's proposal, "Every design is custom engineered to meet our client's unique requirements," as the basis of its breach of express warranty claim. MECS moves for summary judgment on this claim, arguing that the term was not one on which the communications of the parties agreed and thus did not become part of the contract established by their performance. Alternatively, it argues that the statement was too general to form an express warranty.

Under Missouri law, an express warranty is created by

> [a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain . . . that the goods shall conform to the affirmation or promise.

---

[2] Axiall also argues that it will be prejudiced by having to replead its allegations, which were made under Louisiana law, if the court finds that Missouri law should apply. But Axiall has already made a claim for breach of the warrant of merchantability, which is Missouri's analog to redhibition. Furthermore, it cites no state-specific law under its claims. Accordingly, the court finds no need for amendment.

Mo. Stat. Ann. § 400.2-313(a). There is no requirement that the promise be part of the contract; instead the plaintiff merely has to show that the representation "induced plaintiff's purchase of, or was a material factor in plaintiff's decision to purchase the goods." *Cambridge Eng'g, Inc. v. Robertshaw Controls Co.*, 966 F.Supp. 1509, 1522 (E.D. Mo. 1997) (citing *Carpenter v. Chrysler*, 853 S.W.2d 346, 357 (Mo. Ct. App. 1993)). The statement was on the first page of the proposal, on MECS letterhead, and was sent to Axiall before the order was placed. It is fairly attributable to the company even though it is not part of the proposal's terms and conditions. Axiall claims reliance on that statement. Accordingly, it could form the basis of a warranty even though the proposal's terms did not form the contract.

The court next considers MECS's argument that the statement was too general to form an express warranty. "An affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." *Carpenter*, 853 S.W.2d at 357. Axiall claims that it viewed MECS's statement, however, as promising custom engineering of its products. This is a reasonable interpretation; the statement literally says that MECS's products are "custom engineered to meet [the] client's unique requirements." Accordingly, summary judgment must be denied as to this claim.

### C. Breach of Contract

MECS next moves for summary judgment on the breach of contract claim, arguing that Axiall fails to identify any contract term it breached. It further asserts that it complied with its obligations under the parties' writings by providing the ES 208 demisters, free of

defect, even though those demisters would not function in Axiall's facilities. Axiall maintains that the demisters' lack of suitability for the Beauharnois plant amounted to a breach of contract, though it fails to identify any specific contract term.

Missouri has adopted the Uniform Commercial Code and its courts apply Section 2-207. *Oakley Fertilizer, Inc. v. Continental Ins. Co.*, 276 S.W.3d 342, 346–47 (Mo. Ct. App. 2009). Accordingly, the contract formed by these parties' performance consists of the terms on which their writings agree, "together with any supplementary terms incorporated under any other provisions of this Act." UCC § 2-207(3). There is a split in authority over whether these "supplementary terms" include merely gap-fillers under the UCC or also terms "arrived at through a course of dealing." *PCS Nitrogen Fertilizer, LP v. Christy Refractories, LLC*, 225 F.3d 974, 977 & n. 2 (8th Cir. 2000). Assuming *arguendo* that the latter holds, the court finds that Axiall may be able to establish that its expectations regarding function and custom design became part of the contract by performance. Accordingly, summary judgment must be denied on this claim.

**D. Implied Warranty and Redhibition**

MECS also moves for summary judgment on Axiall's claims of redhibition and breach of implied warranties of merchantability and fitness for a particular purpose. The redhibition claim must be dismissed because this matter is proceeding under Missouri law. As for the implied warranty claims, Missouri law provides as to merchantability that the goods must be "fit for the ordinary purpose for which such goods are used." Mo. Stat. Ann. § 400.2-314(2)(c). This warranty can only be breached, in other words, when a defect leaves the product "unfit for the purpose for which it was designed." *Holman*, __ F.Supp.3d

\_\_, 2023 WL 1438752 at *9. MECS maintains that its filters were fit for their ordinary purpose and that they function within many other facilities, including other plants owned by Axiall. But as Axiall notes, MECS has offered several hypotheses and yet failed to provide any proof of why the filters would not function at the Beauharnois facility. Doc. 96, p. 15 ("All of these issues, which had nothing to do with MECS, could have played a role in Axiall's problem.") Additionally, MECS has admitted that the Koch demisters that preceded the 2019 installation of Axiall demisters were standard pack design. *Id.* at 14.

A plaintiff may show lack of merchantability "by showing a specific defect in the goods or by circumstantial evidence." *Plunk v. Hedrick Concrete Prods. Corp.*, 870 S.W.2d 942, 947 (Mo. Ct. App. 1994). Based on the evidence of the demisters' failure to perform properly at the Beauharnois facility and MECS's failure to prove why, Axiall should be allowed to proceed to trial on the claim.

Finally, a claim for breach of warranty for a particular purpose arises under Missouri law when "the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods[.]" Mo. Rev. Stat. Ann. § 400.2-315. "Under this section the buyer need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended or of his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists." *Id.* at cmt. 1. Circumstantial evidence shows that Axiall might have reasonably relied on MECS's representations of its expertise. At the same time, questions of fact exist as to whether MECS adequately investigated the

specifications required to produce the demisters. Accordingly, summary judgment should likewise be denied on this claim.

### E. Attorney Fees

Finally, MECS asks the court to rule that attorney fees are unavailable in this matter. The general rule under Missouri law is that such fees are only available when provided for by statute or expressly in a contract. *Berry v. Volkswagen Grp. Of Am., Inc.*, 397 S.W.3d 425, 431 (Mo. 2013). Neither party makes an argument for a contractual provision. The only statutory basis Axiall puts forth for recovery of such fees is its redhibition claim. *See* La. Civ. Code art. 2545. Because that claim is unavailable here, Axiall may not recover attorney fees in its pursuit. Accordingly, summary judgment will be granted on this matter.

## IV.
### CONCLUSION

For the reasons stated above, the Motion for Summary Judgment [doc. 96] will be **GRANTED IN PART** and **DENIED IN PART**, resulting in the dismissal of the redhibition claim and related claim for attorney fees with prejudice.

**THUS DONE AND SIGNED** in Chambers this 10th day of July, 2023.

JAMES D. CAIN, JR.
UNITED STATES DISTRICT JUDGE